**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KARI STANKIEWICZ BERRY, as** | : | |
| **Administratrix of the Estate of** | : | **CIVIL ACTION** |
| **MICHAEL BERRY, deceased,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA, et al.,** | : | **No. 14-2608** |
| **Defendants.** | : | |

**<u>MEMORANDUM</u>**

**Schiller, J.**                                                                                  **May 20, 2016**

Philadelphia Police Officer James Boone shot and killed Michael Berry ("Berry") in the early morning hours of Monday, August 27, 2012. Berry's wife, acting on behalf of his estate, is now suing Officer Boone, the City of Philadelphia, and Officers Terry Mulvey and Thomas Bellon, who were also present at Berry's death. All Defendants now move for summary judgment. The Court will grant in part and deny in part the motion, allowing Plaintiff's 42 U.S.C. § 1983 excessive force claim against Officer Boone and her *Monell* claim against the City of Philadelphia to go forward.

**I.       BACKGROUND**

James Boone entered the police academy in 2007 and became a Philadelphia Police Officer in 2008. (Pl.'s Resp. Mot. Summ. J., Ex. B [Boone Service Record].) Boone failed his first psychological examination necessary to become a police officer on January 27, 2007. (*Id.*, Ex. A [Psych Records].) Nonetheless, Boone was re-evaluated on August 30, 2007 and passed.

(*Id.*) In Officer Boone's eight years on the force, he has discharged his weapon four times, two of which have resulted in deaths. (*Id.*, Ex. W [Concise Officer History].)

On the night of Sunday, August 26, 2012 into Monday, August 27, 2012, Officer Boone was working the 8 p.m. to 4 a.m. shift with fellow officers Mulvey and Bellon. (Defs.' Mot. Summ. J., Ex. B [Boone IAD Statement].) Officer Boone was driving an unmarked Crown Victoria, and all three officers were dressed in plainclothes. (*Id.*) Officer Bellon sat in the front passenger seat and Officer Mulvey sat directly behind him. (*Id.*)  Shortly after midnight, they responded to a radio call reporting a large fight in front of a bar and a person armed with a weapon at D Street and Wyoming Avenue. (*Id.*, Ex. C [Radio Recordings].) The officers arrived at the intersection traveling north on D Street. (*Id.*, Ex. D [Boone Dep.] at 24.) In addition to the altercation in the street directly in front of them, they saw Berry to their left, leaning into a red parked car on Wyoming Ave. (*Id.* at 27–28.) Officer Boone believed that Berry was assaulting someone who was in the car, so he turned westbound onto Wyoming Avenue and parked behind the red car. (Boone IAD Statement.)

A surveillance video captured the events that followed. (Defs.' Mot. Summ. J., Ex. E [Video].) Officer Boone exited the car into the street and Officer Bellon exited onto the sidewalk. (*Id.*) Officer Mulvey exited onto the sidewalk slightly after Officers Boone and Bellon. (*Id.*, Ex. F [Slow Motion Video].) As Officers Boone and Bellon stepped out of the Crown Victoria, Berry turned away from the window of the red car. (*Id.*) He walked toward Officer Bellon, who simultaneously moved toward Berry. (*Id.*) Officer Boone, who was then walking around the front of the Crown Victoria, discharged eight rounds from his Glock semi-automatic pistol, striking Berry six times. (Pl.'s Resp. Mot. Summ. J., Ex. N [IAD Summary].) The

shooting occurred within five seconds of Officer Boone stepping out of his car. (Video.) Boone radioed for medical assistance, and Berry was pronounced dead on the scene. (Radio Recordings.)

Officer Boone averred that when he got out of the Crown Victoria, he saw that Berry was wearing a set of brass knuckles with a knife attached to them. (Boone Dep. at 36.) In his deposition, he initially stated the knife was in Berry's right hand, which would have been nearer to Officer Boone. (Boone Dep. at 36–37.) However, in his Internal Affairs Division statement in March 2013, he stated that the knife was in Berry's left hand. (Boone IAD Statement at 5.) Officer Boone also stated that Officer Bellon displayed his badge and identified himself as police prior to the shooting, and that both Officers Boone and Bellon yelled at Berry to stop and drop the knife. (Boone Dep. at 40–41.) Officer Boone stated that he shot Berry in order to protect Officer Bellon from being stabbed. (Boone IAD Statement at 6.)

Officer Bellon stated that prior to the shooting he showed his badge and said "police, stop" to Berry, who was coming forward with a blade in his right hand. (Defs.' Mot. Summ. J., Ex. I [Bellon Dep.] at 78–83.) Officer Bellon averred that he was attempting to withdraw his firearm to defend himself at the time Officer Boone shot Berry. (*Id.* at 81.) However, in the surveillance video, it appears that Officer Bellon did not reach for his weapon until after Officer Boone began to shoot. (Slow Motion Video.) Officer Mulvey also stated that he saw the knife in Berry's right hand, and then identified himself as police and told Berry to drop the weapon and get on the ground. (Defs.' Mot. Summ. J., Ex. G [Mulvey Dep.] at 47–49.) Officer Boone shot Berry about two seconds after Officer Mulvey stepped out of the car. (Video.) The knife is not

visible in the video, but a set of brass knuckles with a 3½-inch blade was collected at the scene. (*Id.*; IAD Summary at 5.)

Berry's death came during a period of rising officer-involved shootings within the Philadelphia Police Department ("PPD"). (Pl.'s Resp. Mot. Summ. J., Ex. V [DOJ Report] at 1.) As a result, in 2013, PPD Commissioner Charles Ramsey requested technical assistance from the Department of Justice ("DOJ"), who set out to examine and reform the PPD's deadly force policies and practices. (*Id.*) The report, titled *Collaborative Reform Initiative: An Assessment of Deadly Force in the Philadelphia Police Department* ("DOJ Report"), was issued in 2015 and includes numerous recommendations for improvements to the PPD's use of force policies and training programs.

Plaintiff filed this lawsuit in state court in April 2014 and Defendants removed to this Court on May 6, 2014. Pursuant to 42 U.S.C. § 1983, the Complaint alleges violations of the Fourth and Fourteenth Amendments and *Monell* municipal violations, as well as state tort law and constitutional claims. The Court now grants Defendants' motion for summary judgment on the Fourteenth Amendment, state law, and state constitutional claims, and grants summary judgment in favor of Officers Bellon and Mulvey on all claims. It denies the motion with regard to Plaintiff's Fourth Amendment excessive force claim against Officer Boone and her *Monell* claim against the City of Philadelphia.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and when the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). When

the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Thereafter, the nonmoving party demonstrates a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248. Where the moving party bears the burden of persuasion at trial, it must establish the absence of a genuine issue of material fact. *Nat'l State Bank v. Fed. Reserve Bank of N.Y.*, 979 F.2d 1579, 1582 (3d Cir. 1992).

In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 286 (3d Cir. 2009). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III.   DISCUSSION

### A.   Fourth Amendment Excessive Force Claim Against Officer Boone

Plaintiff alleges that Officer Boone used excessive force against Berry, and therefore infringed on Berry's Fourth Amendment right to be free from unreasonable seizure. (Pl.'s Mem. Law Supp. Resp. Mot. Summ. J. at 11.) Defendants disagree and argue that qualified immunity shields Officer Boone from liability. (Defs.' Mem. Law Supp. Mot. Summ. J. at 5.)  Qualified immunity protects government officials performing discretionary functions from liability "as

long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). A qualified immunity analysis requires a court to ask two questions: (1) "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" and, if so, (2) was the right clearly established at the time of the violation? *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

### 1. Did Boone Violate a Constitutional Right?

"To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004). The parties agree that Officer Boone seized Berry when he shot him to death. *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Therefore, the question of whether he violated Berry's Fourth Amendment rights boils down to whether Officer Boone acted reasonably, as judged from the perspective of a reasonable officer in his position. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). The Third Circuit has defined the test for reasonableness in deadly force cases as follows: "Giving due regard to the pressures faced by the police, was it objectively reasonable for the officer to believe, in light of the totality of the circumstances, that deadly force was necessary to prevent the suspect's escape, and that the suspect posed a significant threat of death or serious physical injury to the officer or others?" *Abraham v. Raso*, 183 F.3d 279, 289 (3d Cir. 1999). Factors relevant to this determination include the facts and circumstances of the case, namely the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, whether the action took place in the context of effecting an arrest and, if so, if the suspect actively resisted

arrest, the duration of the action, the possibility the suspect was armed, and the number of people involved. *Green v. N.J. State Police*, 246 F. App'x 158, 161 (3d Cir. 2007).

Courts must apply this standard with an understanding that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Abraham*, 183 F.3d at 289. However, courts must also be "cautious to ensure that the officers are not taking advantage of the fact that the witness most likely to contradict their story—the person shot dead—is unable to testify," and therefore should avoid simply accepting the officers' account of the event. *Lamont v. New Jersey*, 637 F.3d 177, 181–82 (3d Cir. 2011). As a result, summary judgment is inappropriate if there is circumstantial evidence that, if believed, could contradict the officer's testimony and convince a factfinder that he acted unreasonably. *Id.* at 182. However, the plaintiff cannot meet her burden by merely asserting that a rational jury might decline to credit the officer's testimony. *Id.* The fact-intensive nature of the reasonableness inquiry means that it should often be resolved by a jury, but summary judgment can be appropriate where "the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Abraham*, 183 F.3d at 290.

Defendants argue that undisputed evidence shows that Officer Boone acted reasonably in using deadly force to prevent Berry from stabbing Officer Bellon. Plaintiff, however, disputes several facts that are key to Defendants' narrative. First, Plaintiff argues that the surveillance video shows that, at the time he was shot, Berry was not "charging" Officer Bellon, but rather was retreating back into the bar and trying to make sure that Marco Lopez, the man in the car

who Berry had been fighting with, did not follow him. (Pl.'s Mem. Law Supp. Resp. Mot. Summ. J. at 2, 12.) Defendant responds that even if that were true, it is constitutionally reasonable to prevent escape by deadly force if the officer has probable cause to believe the individual poses a threat of serious physical harm to others. *See Garner*, 471 U.S. at 11.

After carefully reviewing the surveillance video in slow motion, the Court finds that it is susceptible to several plausible interpretations. Berry walks diagonally across the sidewalk, so that he is moving both toward Officer Bellon and toward the entrance of the bar. (Slow Motion Video.) Officer Bellon is also moving toward Berry at the same time, which a jury could deem inconsistent with the idea that Berry was about to attack Officer Bellon. (*Id.*) Although Berry appears to turn and look back at one point, it is not clear if he is looking for Lopez or at Officer Boone, who is about to begin shooting him. (*Id.*) The civilian witnesses who police investigators interviewed about the incident also gave varying descriptions, with some saying Berry had just turned from the window and was moving away from the car when he was shot, and others saying he was moving aggressively toward the officers. (IAD Summary.) These conflicting views mean that a jury must determine whether Berry was approaching Officer Bellon in a threatening manner or simply trying to extricate himself from the fight with Lopez.

Plaintiff also questions whether Berry was actually holding a knife, and if so, whether Officer Boone saw it prior to the shooting. (Pl.'s Mem. Law Supp. Resp. Mot. Summ. J. at 2–4.) However, the undisputed evidence shows that Berry was stabbing Lopez just before the officers arrived. (IAD Summary at 3 (summarizing interviews with Lopez and his girlfriend, Lillian Burgos).) A witness also describes at least one of the officers yelling at Berry to "Put the knife down!" prior to the shooting. (Defs.' Reply Supp. Mot. Summ. J., Ex. N [Deippa Statement] at

211.) Therefore, the Court cannot infer, as Plaintiff suggests, that the knife was not Berry's at all. (*See* Pl.'s Mem. Law Supp. Resp. Mot. Summ. J. at 3.) Nonetheless, the Court agrees with Plaintiff that the evidence is unclear at this stage as to how Berry was holding the knife and what Officer Boone could see at the critical moment. The knife is not visible in the video, and none of the civilian witnesses interviewed describe the position of the knife at the time Officer Boone shot Berry. (Slow Motion Video; IAD Summary.) The officers provided conflicting accounts of the location and position of the knife. (Boone IAD Statement at 154; Boone Dep. at 36–43; Bellon Dep. at 79; Mulvey Dep. at 47.) Drawing all inferences in favor of Plaintiff, it is possible a jury could believe that Berry was holding the knife but not actually threatening Officer Bellon with it, or that Officer Boone did not see the knife until after the shooting.

The survival of Plaintiff's excessive force claim depends on whether it was objectively reasonable for Officer Boone to believe that the use of deadly force was necessary to prevent Berry from causing serious bodily injury to Officer Bellon or others. *See Abraham*, 183 F.3d at 289. Several factual narratives could be consistent with the surveillance video. (Slow Motion Video.) These factual disputes bear directly on the reasonableness of the perceived threat. Therefore, a jury must resolve the question of whether Officer Boone violated Berry's Fourth Amendment rights.

### 2.   *Was the Right Clearly Established?*

Even when a plaintiff can show a violation of constitutional rights, qualified immunity may shield an officer from trial. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). In the second step of the *Saucier* analysis, courts must consider whether the right violated was clearly established at the time of the incident. *Saucier*, 533 U.S. at 201. At summary judgment, a court

9

asks: "in the factual scenario established by the plaintiff, would a reasonable officer have understood that his actions were prohibited?" *Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir. 2002).

Since the Third Circuit's 1999 decision in *Abraham*, the contours of the right to be free from the use of excessive force have been clear. *See Zion v. Nassan*, 556 F. App'x 103, 108 (3d Cir. 2014) (holding that *Abraham* remained good law that could clearly establish a constitutional right for the purpose of qualified immunity); *Lamont*, 637 F.3d at 185 ("Assuming (as we must) that [the plaintiff's] view of the evidence is the one that ultimately will prevail, the troopers are clearly not entitled to qualified immunity. It has long been the law that an officer may not use deadly force against a suspect unless the officer reasonably believes that the suspect poses a threat of serious bodily injury to the officers or others."). Therefore, in this case, the same disputed facts that preclude summary judgment on the first *Saucier* prong make qualified immunity inapposite here. If, as Plaintiff argues, Officer Boone shot Berry without a reasonable belief that deadly force was necessary to prevent serious injury to Officer Bellon, he would not be entitled to qualified immunity, because a reasonable officer in Officer Boone's position would have known that these actions violated a constitutional right. *See Couden v. Duffy*, 446 F.3d 483, 497 (3d Cir. 2006) (noting that the "factors relevant to the excessive force analysis are well-recognized").

The Court cannot accept Defendants' suggestion that a reasonable officer in Officer Boone's position could not have understood that his actions were prohibited because of the need to make a split-second decision under rapidly evolving circumstances. (*See* Defs.' Mem. Law. Supp. Mot. Summ. J. at 11.) While the Court recognizes the pressures police officers face when

entering potentially dangerous situations, those pressures are more appropriately considered when determining whether a use of force was reasonable or excessive. *See Abraham*, 183 F.3d at 289 (noting that the determination of whether a use of force was objectively reasonable must allow for the fact that police officers must often make quick decisions in tense situations). Here, the Court has determined that even taking into account the realities of police work, factual disputes prevent a determination that Officer Boone's use of deadly force was reasonable. If the mere fact that an officer faced time pressure in making a decision were to entitle him to qualified immunity, plaintiffs would almost never survive summary judgment on excessive force claims. Instead, the "clearly established" inquiry only requires courts to find that the contours of the relevant law were clear at the time of the incident. *See Lamont*, 637 F.3d at 185. Here, they were. Therefore, the Court will deny Defendants' Motion for Summary Judgment on the excessive force claim against Officer Boone.

## B.     *Monell* Claim Against the City of Philadelphia

Even if Plaintiff can prove that Officer Boone violated Berry's constitutional rights, she may not hold his employer, the City of Philadelphia, liable under § 1983 through a theory of *respondeat superior*. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Rather, in order to hold the city liable, she must prove that a municipal policy or custom caused the constitutional violation. *Berg v. Cty. of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000). A plaintiff may establish a municipal policy where a policymaker with final authority on the subject in question issued an official policy that governed the allegedly unconstitutional action. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). She may demonstrate the existence of a custom by showing that the practices of state officials were so permanent and well-settled that they effectively operated as

law. *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990). Either way, the plaintiff must show that a municipal policymaker is "responsible by action or acquiescence for the policy or custom," and that the municipality acted with deliberate indifference to the alleged constitutional deprivation. *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 250 (3d Cir. 2007). Finally, a plaintiff must establish a "direct causal link" between the municipal policy or custom and the constitutional deprivation. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). However, "as long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990). Here, Plaintiff proposes two different theories of municipal liability: failure to train and failure to adequately screen.

### 1. *Failure to Train*

Failure to adequately train police officers can serve as the basis for § 1983 municipal liability, but only when it "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388. This occurs when the need for more or different training is obvious and the inadequacy is very likely to result in a violation of constitutional rights. *Id.* at 390. In order to meet this standard, a plaintiff must ordinarily show that the failure has caused a pattern of violations. *Berg*, 219 F.3d at 276.  In this Circuit, plaintiffs seeking to establish deliberate indifference must show that "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999).

In support of her *Monell* claim, Plaintiff relies heavily on the DOJ Report, which identifies numerous policies and practices that inadequately train officers on the use of force. According to the report, PPD's Directives 10 and 22 provide inadequate guidance to officers on when it is appropriate to discharge a firearm. (DOJ Report at 42 (finding that the two Directives are inconsistent); 43–44 (finding that Directive 10 is too vague in its description of use of force decisionmaking).) Moreover, the report finds that "PPD officers do not receive regular, consistent training on the department's deadly force policy," causing most officers to mistakenly believe that subjective fear for their lives is a sufficient justification for the use of deadly force. (*Id.* at 40.) Additionally, many PPD recruits do not receive hands on de-escalation training, and the majority of training scenarios they do see in the police academy end with the use of force rather than peaceful de-escalation. (*Id.* at 69, 73, 74.) After the academy, officers do not receive regular in-service training on the use of force or defensive tactics. (*Id.* at 81–86.) "This evidence is sufficient that a reasonable jury could find that the City has a custom of failing to train its police officers on the use of deadly force." *Coyett v. City of Philadelphia*, Civ. A. No. 15-869, 2015 WL 8482815, at *7 (E.D. Pa. Dec. 10, 2015)

Applying the *Carter* test, a rational jury could find that this failure to train rises to the level of deliberate indifference to the risk of constitutional violations. The first and third prongs of the test are easily satisfied, because municipal policymakers undoubtedly knew that officers would confront situations where they would have to determine whether to use deadly force, and that the wrong choice was likely to lead to a constitutional violation. *See City of Canton*, 489 U.S. at 390 n.10 ("[C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. . . . Thus, the need to train officers in the constitutional

limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights.") The second prong requires a history of employees mishandling the situation. *See Carter*, 181 F.3d at 257. In 382 shootings by PPD officers between 2007 and 2013, 15.4% of the victims were unarmed. (DOJ Report at 27.) Moreover, between 2009 and 2014, the city settled twenty-nine shooting lawsuits for a total of over $13 million. Todd Feathers, *Police Misconduct in Philadelphia, by the Numbers*, Muckrock (Oct. 20, 2014), https://www.muckrock.com/news/archives/2014/oct/20/philly-lawsuits/. In fact, in 2013, Commissioner Ramsey requested that the DOJ provide technical assistance in reducing fatal officer-involved shootings after such shootings rose despite a drop in violent crime. (DOJ Report at 1.) Taken together, the Court believes this evidence could lead a reasonable jury to determine that the City of Philadelphia knew about a pattern of violations of constitutional rights and, at the time of Berry's death in 2012, was deliberately indifferent to the inadequacies of the PPD's deadly force training.

Notably, both courts in this District that have addressed this DOJ Report in the context of summary judgment motions on § 1983 *Monell* claims have similarly denied the defendants' motions. *See Valdez v. City of Philadelphia*, Civ. A. No. 12-7168, 2016 WL 2646667, at *4 (E.D. Pa. May 10, 2016); *Coyett*, 2015 WL 8482815, at *5. In both cases, the courts found that the DOJ Report contained sufficient evidence to allow a jury to believe that the PPD had a custom of failing to train its police officers on the use of deadly force that rose to the level of deliberate indifference. *Valdez*, 2016 WL 2646667, at *4; *Coyett*, 2015 WL 8482815, at *7. Two additional cases in this District relied on the DOJ Report to deny motions to dismiss *Monell*

claims. *Brown-Dickerson v. City of Philadelphia*, Civ. A. No. 15-4940, 2016 WL 1623438, at
*10 (E.D. Pa. Apr. 25, 2016); *Harris v. City of Philadelphia*, Civ. A. No. 15-3689, 2016 WL
1073233, at *5 (E.D. Pa. Mar. 18, 2016).

Finally, there is sufficient evidence of a causal link between the PPD's training failures
and Berry's death for Plaintiff to defeat summary judgment. At his deposition, Officer Boone did
not remember if he had received any additional training on the Department's use of force or
firearm discharge policies since he was in the academy. (Boone Dep. at 61–65.) He also did not
remember whether, prior to shooting Berry, he considered moderate uses of force that could have
de-escalated the situation. (*Id.* at 70.) This testimony is consistent with the DOJ Report's
findings that officers did not receive regular in-service use of force or defensive tactics training.
(DOJ Report at 81, 86.) When asked to describe the training he received on these topics in the
academy, Officer Boone spoke about a "use of force continuum," but could not remember any
steps on the continuum between verbal commands and deadly force. (Boone Dep. at 57–58.) The
DOJ Report found that the PPD has two different use of force models, which can cause
confusion, and that Directive 10, the policy on firearm discharge, was vague and relied too
heavily on the use of force continuum. (DOJ Report at 42–44.) Officer Boone's lack of clarity
about the policy could have resulted from these confusing directives. His emphasis on the deadly
force stage of the continuum could also reflect the PPD's failure to provide training scenarios
that end with successful de-escalation. (*See* DOJ Report at 73.)

Whether the PPD's failure to adequately train its officers caused a constitutional violation
is a question for a jury. *See Coyett*, 2015 WL 8482815, at *8. At this stage, Plaintiff has put
forward sufficient evidence to allow a reasonable jury to infer that Berry's death could have been

avoided if Officer Boone had been better trained. *See Thomas v. Cumberland Cty.*, 749 F.3d 217, 226 (3d Cir. 2014). Therefore, the Court will deny summary judgment on this claim.

### 2. *Failure to Screen*

Plaintiff also suggests that the City of Philadelphia is liable for allowing Boone to become a police officer less than a year after failing his psychological evaluation, even though the first psychologist stated that he needed years of additional experience and maturity before he would be prepared for the job. (Pl.'s Mem. Law Supp. Resp. Mot. Summ. J. at 22; Psych Records.) The Court deplores the fact that the PPD invested money in a psychological evaluation that it subsequently ignored. Why would the city employ psychologists to evaluate its recruits for the very character flaws that may lead to the use of excessive force, and then disregard the results? The Court believes the City should take the psychological screening of applicants for such a sensitive job more seriously. However, in *Monell* cases based on failure to adequately review the record of an applicant who goes on to commit a constitutional violation, courts must "carefully test the link between the policymaker's inadequate decision and the particular injury alleged." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410 (1997). A plaintiff must show deliberate indifference, meaning that it should have been obvious, upon appropriate scrutiny, that this officer was highly likely to inflict the particular constitutional injury at issue. *Id.* at 411–12. Like a failure to train claim, this showing of deliberate indifference ordinarily requires evidence of a pattern of violations. *Berg*, 219 F.3d at 276. In this case, Plaintiff has not advanced any evidence of a pattern of inadequate screenings that have led to constitutional violations. Therefore, the Court will grant Defendants' Motion for Summary Judgment with respect to a failure to adequately screen theory of *Monell* liability.

### C.      State Tort Law Claims

Counts V and VI are wrongful death and survival actions under Pennsylvania law. Defendants argue that the Pennsylvania Tort Claims Act shields them from liability under these statutes. *See* 42 Pa. Cons. Stat. Ann. § 8541 ("[N]o local agency shall be liable for any damages on account of any injury to a person or property . . . ."); 42 Pa. Cons. Stat. Ann. § 8545 (limiting the scope of employee liability to that of the employing agency). Plaintiff invokes an exception to this immunity for acts of employees that constitute crimes, actual fraud, actual malice, or willful misconduct. *See* 42 Pa. Cons. Stat. Ann. § 8550.

Under Pennsylvania law, police officers may be liable for assault and battery when their use of force is unnecessary or excessive. *Bornstad ex rel. Estate of Bornstad v. Honey Brook Twp.*, Civ. A. No. 03-3822, 2005 WL 2212359, at *22 (E.D. Pa. Sept. 9, 2005). However, even if an officer acted unreasonably, he may only be held liable under the exception to the Tort Claims Act if his behavior amounted to a willful misconduct. *Sameric Corp. v. City of Philadelphia*, 142 F.3d 582, 600–01 (3d Cir. 1998). Pennsylvania law requires a subjective inquiry into whether the officer *actually knew* his actions violated the law. *Hammock v. Borough of Upper Darby*, Civ. A. No. 06-1006, 2007 WL 3232115, at *10 (E.D. Pa. Oct. 31, 2007). A plaintiff must show that the officer specifically intended to use excessive force. *Mazzarella v. Brady*, Civ. A. No. 14-5654, 2016 WL 75041, at *5 (E.D. Pa. Jan. 7, 2016); *Bennett ex rel. Irvine v. City of Philadelphia*, Civ. A. No. 03-5685, 2006 WL 1371189, at *13 (E.D. Pa. May 17, 2006).

Here, Plaintiff has not introduced any evidence to show that Officer Boone intended to violate Berry's constitutional rights. The disputes of material fact in this case concern whether his actions were reasonable, not whether they were willful. Therefore, Plaintiff cannot meet her

burden, and the Court will grant summary judgment on these counts. *See Anderson*, 477 U.S. at 248.

### D.    State Constitutional Claim

Count VII of the Complaint alleges violations of Article I, Sections 1, 7, 8, 9, 13, and 26 of the Pennsylvania State Constitution. However, the state constitution does not provide its own cause of action for excessive force, because the protection of Article I, Section 8 is coextensive with the Fourth Amendment. *Jones v. City of Philadelphia*, 890 A.2d 1188, 1216 (Pa. Commw. Ct. 2006). "[F]ederal courts regularly hold that there is no private cause of action for monetary damages for violations of Pennsylvania Constitutional rights." *Williams v. City of Johnstown*, Civ. A. No. 15-144, 2016 WL 1069100, at *5 (W.D. Pa. Mar. 17, 2016). Therefore, the Court grants summary judgment on this count.

### E.    Fourteenth Amendment Claim

Counts II and IV allege violations of the Fourteenth Amendment pursuant to the state-created danger doctrine. To make out a § 1983 state-created danger claim, a plaintiff must show the following:  (1) the harm caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) some relationship existed between the state and the plaintiff that renders plaintiff a foreseeable victim; and (4) "a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." *Bright v. Westmoreland Cty.*, 443 F.3d 276, 281 (3d Cir. 2006). Plaintiff argues that the manner in which the officers approached Berry created the alleged justification for his killing, and therefore meets

these requirements. (Pl.'s Mem. Law Supp. Resp. Mot. Summ J. at 24.) However, the officers' actions leading up to the shooting in no way shock the conscience. This case is more appropriately resolved within the rubric of the Fourth Amendment. The Court grants summary judgment on this claim.

>    **F.**    **Claims Against Defendants Bellon and Mulvey**

The only claims that survive summary judgment are the § 1983 excessive force claim and the related *Monell* claim. Neither claim implicates Officers Bellon or Mulvey, because they did not use any force against Berry. While Plaintiff alleges that they conspired to cover for Officer Boone, she does not identify any constitutional right that they violated. (*See id.* at 25.) Therefore, the Court grants summary judgment in favor of Officers Bellon and Mulvey on all claims and dismisses them from the case.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part. Defendants Bellon and Mulvey are dismissed from the case, which will proceed to trial on the § 1983 excessive force and *Monell* claims only.